CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

DEC 17 2015

JULIA C. DUDLEY, CLERK
BY: /s/ K. Bolm
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
for the
Western District of Virginia

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )  Case No. 15-SW-
2456 MARTINSBURG PIKE, STEPHENSON, VIRGINIA, )  5:15mj00076
22656, WHICH IS A SINGLE FAMILY HOME )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A, Property to Be Searched

located in the _____Western_____ District of _____Virginia_____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B, Property to Be Seized

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 924(c) | Using, carrying, or possession of a firearm during and in relation to a crime of violence or drug trafficking crime |

The application is based on these facts:
See attached Affidavit and Attachments, incorporated herein.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Reviewed by AUSA/SAUSA:
AUSA J. Tyler McGaughey (EDVA)

Special Agent Michael A. Fernald, ATF
*Printed name and title*

Received by reliable electronic means
and sworn and attested to by phone.
~~Sworn to before me and signed in my presence.~~

Date: 12/17/2015

_____
*Judge's signature*

City and state: Harrisonburg, Virginia

The Honorable Joel Hoppe, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF VIRGINIA

Harrisonburg Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ) | 1:15-sw- 5:15mj00076 |
| ) | |
| 2456 Martinsburg Pike, Stephenson, Virginia, ) | |
| 22656, which is a one-story, single family home ) | |

### AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Michael A. Fernald, being duly sworn, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 2456 Martinsburg Pike, Stephenson, Virginia, hereinafter "SUBJECT PREMISES," further described in Attachment A, for the things described in Attachment B.

2. I have been a special agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") since July 2014, and a sworn law enforcement officer for over twelve years. I am currently assigned to the ATF Falls Church II Field Office in northern Virginia. During my time in law enforcement, I have received extensive training in the enforcement of the criminal laws of the United States, as well as extensive training in criminal investigations. I have also participated in numerous investigations involving unlawful narcotics and firearms distribution. In these investigations, I have been involved in the application for and execution of many arrest and search warrants for firearms and narcotics related offenses, resulting in the prosecution and conviction of individuals and the seizure of illegal drugs, weapons, illegal drug proceeds, and other evidence of criminal activity. I have also interviewed individuals involved in firearm and drug trafficking and I

have obtained information from them regarding the acquisition, sale, importation, manufacture, and distribution of firearms and controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by the traffickers and users of firearms and controlled dangerous substances.

3. The facts and information contained in this affidavit are based upon my personal knowledge of the investigation and observations of other law enforcement officers and agents involved in this investigation. All observations referenced below that were not personally made by me were related to me by the persons who made such observations.

4. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

5. In April 2015, ATF opened an investigation targeting drug and firearm distributors in and around Manassas, Virginia. In June 2015, the investigation identified MARIA DEL CARMEN FLORES, a/k/a "VIEJA" or "CORINA," as a distributor of both drugs and firearms. From July 2015 to the present, ATF has used two confidential sources to make at least thirteen controlled buys from CARMEN FLORES, purchasing a total of approximately 14.5 ounces (410 grams) of cocaine, twelve firearms, and ammunition. Over the course of the investigation, ATF agents have confirmed that CARMEN FLORES resides at the SUBJECT PREMISES. For the reasons set forth below, I respectfully submit there is probable cause to believe that evidence of drug and firearm offenses is located within the SUBJECT PREMISES.

2

A. <u>Controlled Buys</u>

6. From July 2015 to the present, ATF has used two confidential sources, referred to herein as "CS-1" and "CS-2," to make controlled buys from CARMEN FLORES. For the purposes of this affidavit, both confidential sources will be referred to in the masculine gender regardless of whether they are in fact male or female. Both confidential sources are cooperating with law enforcement in exchange for money, and CS-1 is also cooperating for deferred action in regards to his immigration status. Agents have corroborated and verified the information provided by CS-1 and CS-2 through a variety of investigative methods, including physical and video surveillance, controlled purchases, and recorded phone calls. I, therefore, consider CS-1 and CS-2 to be reliable.

7. On July 15, 2015, CS-1 purchased approximately one ounce of cocaine from CARMEN FLORES for $1,200.

8. On July 30, 2015, CS-1 arranged to purchase approximately two ounces of cocaine from CARMEN FLORES for $2,400. The cocaine was delivered by a "runner," who was later identified as CARMEN FLORES' niece.

9. On August 6, 2015, CS-1 purchased approximately two ounces of cocaine from CARMEN FLORES for $2,400.

10. On September 17, 2015, CS-2 purchased approximately one-half ounce of cocaine from CARMEN FLORES for $650.

11. On October 6, 2015, CS-1 purchased approximately one ounce of cocaine from CARMEN FLORES for $1,200.

12. On October 13, 2015, CS-1 purchased a .22 caliber revolver, a rifle, ammunition, and magazines from CARMEN FLORES for $1,050.

13. On October 26, 2015, CS-1 purchased a shotgun, two rounds of ammunition, and two ounces of cocaine from CARMEN FLORES for $2,700.

14. On October 27, 2015, CS-1 purchased a .380 caliber semi-automatic handgun, five rounds of ammunition, two magazines, and one ounce of cocaine from CARMEN FLORES for approximately $2,100.

15. On October 30, 2015, CS-1 purchased a 9mm semi-automatic handgun, 50 rounds of ammunition, and one ounce of cocaine from CARMEN FLORES for approximately $2,150.

16. On November 10, 2015, CS-1 purchased a .30 caliber pistol, a 30-round magazine, and 29 rounds of ammunition from CARMEN FLORES for $1,050.

17. On November 17, 2015, CS-1 purchased a 12-gauge shotgun, a .22 caliber semi-automatic handgun, a .22 caliber revolver, and one ounce of cocaine from CARMEN FLORES for $3,300.

18. On November 30, 2015, CS-1 purchased a 9mm semi-automatic handgun, a .22 caliber rifle, ammunition, and one ounce of cocaine from CARMEN FLORES for $3,000.

19. On December 7, 2015, CS-1 purchased a 12-gauge shotgun, ammunition, a grenade, and two ounces of cocaine from CARMEN FLORES for $3,850. Following the transaction, a bomb technician transported the grenade to a firing range. After a full examination, the bomb technician determined that the fuze assembly and cap had already functioned, the primer was spent, and there was no explosive filler inside the grenade.

### B. CARMEN FLORES resides at the SUBJECT PREMISES

20. On July 15, 2015, CS-1 purchased one ounce of cocaine from CARMEN FLORES for $1,200. ATF agents conducted surveillance of the controlled buy and observed CARMEN FLORES arrive in a blue Ford Expedition bearing Virginia license plate XHD-1599. Following the transaction, ATF agents checked DMV records and learned that the registered address for the vehicle was the SUBJECT PREMISES.

21. On October 1, 2015, CARMEN FLORES was issued a summons for speeding in a school zone by the Frederick County Sheriff's Office. The summons listed her home address as the SUBJECT PREMISES.

22. On October 30, 2015, agent(s) conducting surveillance prior to a controlled buy observed the Ford Expedition bearing Virginia license plate XHD-1599 in the driveway of the SUBJECT PREMISES.

23. On November 10, 2015, agent(s) observed CARMEN FLORES leave the SUBJECT PREMISES prior to a controlled buy.

24. On November 11, 2015, CARMEN FLORES was issued a summons for driving on a suspended or revoked license by the Frederick County Sheriff's Office. The summons listed her home address as the SUBJECT PREMISES.

25. On November 12, 2015, a pole camera was installed outside of the SUBJECT PREMISES.

26. On November 17, 2015, the pole camera showed CARMEN FLORES' Ford Expedition in the driveway of the SUBJECT PREMISES. In addition, the pole camera footage

5

Case 5:15-mj-00076-JCH   Document 1   Filed 12/17/15   Page 6 of 16   Pageid#: 6

showed CARMEN FLORES talking to a man in the driveway before returning inside the SUBJECT PREMISES.

27. On November 20, 2015, agents observed CARMEN FLORES leave the SUBJECT PREMISES prior to a controlled buy that was scheduled for later that night. After the controlled buy was cancelled, agents observed CARMEN FLORES return to the SUBJECT PREMISES for a short time before leaving again and traveling to the area of a local sports bar in Manassas, Virginia.

C. There is probable cause to believe that evidence of drug and firearm offenses is located within the SUBJECT PREMISES

28. On August 19, 2015, CS-1 contacted CARMEN FLORES about purchasing firearms. CARMEN FLORES told CS-1 that she was available to conduct a firearm sale the following day. The confidential source asked CARMEN FLORES if she could send a picture of the firearm(s) that she had for sale. CARMEN FLORES told CS-1 that she would send him a picture as soon as she returned to her residence.

29. On November 5, 2015, CS-1 called CARMEN FLORES and discussed purchasing firearms. CS-1 asked CARMEN FLORES what firearms she had available at the moment, and CARMEN FLORES said that she had a rifle that holds 49 rounds of ammunition. CS-1 asked CARMEN FLORES to send him a picture of the rifle. CARMEN FLORES told CS-1 that she would send him a picture when she was at her residence.

30. On November 20, 2015, CARMEN FLORES called CS-1 and they agreed to meet at 6:00 p.m. that evening so that CS-1 could purchase two shotguns and an AK-47 rifle. Prior to the controlled buy, agents and other law enforcement officers established air and ground surveillance on CARMEN FLORES. At approximately 3:30 p.m., CARMES FLORES was observed leaving the

6

SUBJECT PREMISES. CARMEN FLORES was then followed traveling around Manassas engaging in what appeared to be a number of drug and/or firearm transactions.

    a. At approximately 5:03 p.m., CARMEN FLORES parked her car outside of a residence in Manassas Park, Virginia. At approximately 5:14 p.m., an unidentified male ("UM") walked down from in the vicinity of the residence and entered the front passenger side of CARMEN FLORES' vehicle. Eleven minutes later, at approximately 5:25 p.m., the UM left the vehicle. Based on my training, experience, and knowledge of this investigation, I believe that CARMEN FLORES was engaging in a drug and/or firearm transaction.

    b. At approximately 5:30 p.m., CARMEN FLORES parked her car at a shopping center in Manassas. At approximately 5:38 p.m., a UM entered her vehicle. Approximately six minutes later, at 5:44 p.m., the UM left vehicle. Based on my training, experience, and knowledge of this investigation, I believe that CARMEN FLORES was engaging in a drug and/or firearm sale.

    c. After departing the shopping center, agents followed CARMEN FLORES to the Video Mexico Lindo Market in Manassas. At approximately 6:13 p.m., agents observed an unidentified male (UM) walk up to the driver's side window of CARMEN FLORES's vehicle and engage in a hand-to-hand transaction. Following the transaction, the UM was followed by the Prince William County Police Department Street Crimes Unit ("SCU"). After SCU observed the UM

7

engage in what appeared to be a drug transaction, they arrested the UM and seized approximately 37 grams of cocaine packaged in one-half gram bags.

d. After leaving the Video Mexico Lindo Market, CARMEN FLORES was followed to two more locations where she engaged in what appeared to be drug and/or firearm transactions. At approximately 7:18 p.m., CARMEN FLORES drove to a home that is believed to be the residence of her niece. Two individuals (possibly children) exited the residence and talked with CARMEN FLORES. She departed the residence at approximately 7:22 p.m.

e. After departing the residence, CARMEN FLORES was followed to another residence in Manassas. She got out of her vehicle and placed something in the mailbox. Shortly thereafter, a white van pulled up to the mailbox and a UM got out of the vehicle and retrieved what appeared to be U.S. currency from the mailbox. The van was eventually stopped by SCU and cocaine was found inside the van. Two persons inside the van were arrested by SCU for possession of cocaine.

f. Shortly after the arrests, CARMEN FLORES was observed driving back towards the SUBJECT PREMISES. CS-1 called CARMEN FLORES and asked if she was still coming out to do their deal. CARMEN FLORES told CS-1 that something big happened to one of her people. She said that she was not coming out that night, she had big problems, and that she would explain it to CS-1 later.

8

31. On December 5, 2015, CARMEN FLORES sent CS-1 a text message stating that she had obtained a grenade. CS-1 asked for a photograph, and CARMEN FLORES told CS-1 that she would send a picture when she returned home. The following day, on December 6, CS-1 received a picture of a grenade from CARMEN FLORES. Accompanying the picture was a text message (translated from Spanish) that said, "I don't want to blow up my house."

32. In addition, based on my training and experience, I know the following:

    a. Drug and firearm traffickers frequently keep records of their transactions, such as would be kept by legitimate business persons engaged in the sale of goods. These traffickers maintain and tend to retain accounts of records of drug transactions. Such records typically detail the amounts of controlled substances or cash outstanding, funds that are owed or expended, along with records tending to indicate and identify co-conspirators. Such records may include customer lists, price lists, notes of telephone messages, financial journals, bank account books, notes of money owed, and records of past purchases of drugs. Typically, because of their importance, these records are maintained by drug traffickers on their person and/or at their residences, "safe" or "stash" houses, storage lockers, or facilities and businesses owned or operated by traffickers. These records are stored either electronically in computers or on hardware or software, or on paper, and may be kept for an extended period of time.

    b. Drug and firearm traffickers commonly keep a supply of drugs, firearms, and ammunition on hand for immediate sale. These items are commonly kept on the person, in the residence, or in the vehicles of traffickers. Firearms are also stored to be used to protect the drugs. Traffickers will often hide their supply of firearms, ammunition, and drugs in garages, outbuildings,

9

storage areas and/or sheds associated with their residences, or even in yard areas surrounding such premises by burying the narcotics or otherwise attempting to conceal their presence.

      c.      Drug and firearm traffickers also commonly have large sums of money from the sale of drugs or firearms. Larger sums of cash are often kept in locked or secure containers within a residence or vehicle that remains under the dominion and control of the drug trafficker.

      d.      Drug and firearm traffickers often possess handguns, shotguns, rifles, and other firearms and ammunition, which may be used to facilitate the distribution or possession of the illicit substance. Associated with these weapons, drug traffickers also retain documents that indicate possession, ownership, and acquisition of their weapons.

      e.      People in general receive correspondence at their residences such as phone bills, utility bills, rental agreements, canceled mail, and personal letters. These items, as well as items such as photographs, keys, and personal identification documents, tend to establish the identity of the person(s) having dominion and control over the residence and, as such, over any illicit drug related items found therein. These items typically remain within the residence during the time that the people remain in occupancy of the premises.

## CONCLUSION

33. Based upon the foregoing, I respectfully submit that this affidavit supports probable cause to search the SUBJECT PREMISES described in Attachment A and to seize the items described in Attachment B.

_____
Michael A. Fernald, Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

Received by reliable electronic means and sworn and attested to by phone

~~Subscribed and sworn to before me~~ this __17th__ day of December, 2015.

_____
The Honorable Joel Hoppe
United States Magistrate Judge

## ATTACHMENT A

*Property to be searched*

The property to be searched is 2456 Martinsburg Pike, Stephenson, Virginia, in the Western District of Virginia (the "SUBJECT PREMISES"). The SUBJECT PREMISES is described as a single family home that appears to have one level. The SUBJECT PREMISES has light colored, possibly yellow siding and the front door(s) are white. The front windows are white framed. The below image was taken of the house on December 10, 2015.





## ATTACHMENT B

*Property to be seized*

1. The items to be seized are fruits, evidence, records and information relating to, contraband, or instrumentalities of violations of Title 21, United States Code, Sections 841 and 846 (distribution of controlled substances, possession with intent to distribute controlled substances, and conspiracy to do the same) and Title 18, United States Code, Section 924(c) (using, carrying, or possessing a firearm during and in relation to a crime of violence or drug trafficking crime), including, but not limited to:

   a. Illegal narcotics and drugs, in particular Cocaine Hydrochloride, a Schedule II controlled substance;

   b. United States and foreign currency derived from the sale of controlled substances;

   c. Narcotics or money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notation logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed, or money was possessed or transferred; computer disks, computer printouts, computer codes and computer programs in addition to computer hard disks, computer screens, computer keyboards, and directory disks, which might reveal the receipt of proceeds from narcotics distribution and the transfer, investment, control, and disposition of those proceeds;

d. Bank account records, wire transfer records, bank statements and records, money drafts, letters of credit, safety deposit keys and records, money wrappers, money containers, income tax returns, records of financial transfers, which might reflect the proceeds generated from the sale of narcotics;

e. Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of persons who might be associates in narcotic trafficking activities;

f. Financial instruments purchased with large amounts of currency, which might have been derived from the sale of controlled substances, including travelers checks, bonds, stock certificates, money orders and cashier's checks, passbooks, bank checks, bank deposit tickets, certificates of deposit, and memoranda and other items evidencing the obtaining, secreting, transfer, concealment, and/or expenditure of money; money counting machines, money wrappers and bags;

g. Records, documents and deeds reflecting the purchase or lease/rent of real estate, vehicles, precious metals, jewelry, or other items that might have been obtained with the proceeds of the sales of controlled substances;

h. Records, items, and documents reflecting foreign or domestic travel, which might have been for the purpose of participating in narcotics trafficking, including airline tickets, credit card receipts, travel vouchers,

2

hotel and restaurant receipts, canceled checks, maps and written directions to locations;

i. Handguns, shotguns, rifles, bullet resistant vests, explosives, and other firearms/incendiary devices, ammunition, and magazines, as well as receipts for the purchase of the same, that may be used to facilitate the distribution or possession of with the intent to distribute controlled substances;

j. Indicia of control, or ownership of the premises and things described in this warrant, such as utility bills, telephone bills, loan payment receipts, canceled envelopes and keys, photographs, and bank records.

k. Wireless telephones, mobile telephone, or cellular devices or handheld wireless and/or digital devices used for voice and data communication through radio signals; and

l. Storage mediums utilized to store digital data utilized with devices in paragraph k that can provide evidence of files, or files that were once on the storage medium but has since been deleted or edited, or of a deleted portion of a file.

3